UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT GLASS,
        Plaintiff,


        v.                                    CIVIL ACTION NO.
                                              16-10807-ADB

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,
        Defendant.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER**
**(DOCKET ENTRY # 22); PLAINTTIFF'S MOTION TO REVERSE OR REMAND**
**THE DECISION OF THE COMMISSIONER (DOCKET ENTRY # 17)**

**March 23, 2017**

**BOWLER, U.S.M.J.**

Pending before this court are cross motions by the parties,
plaintiff Robert Glass ("plaintiff") and defendant Carolyn W.
Colvin ("Commissioner"), Acting Commissioner of the Social
Security Administration.  (Docket Entry # 22).  Plaintiff seeks
to reverse or remand the Commissioner's final decision denying
him disability benefits.  (Docket Entry # 17).  The Commissioner
moves for an order to affirm the final decision pursuant to 42
U.S.C. § 405(g).  (Docket Entry # 22).  After conducting a
hearing on January 19, 2017, this court took the motions (Docket
Entry ## 17 & 22) under advisement.

PROCEDURAL HISTORY

On July 16, 2012, plaintiff filed a Title XVI application for supplemental security income ("SSI") alleging that his disability began on August 1, 2010 due to lumbar spinal injury, cervical spinal injury, bone spurs and sleep apnea. (Docket Entry # 11, Tr. 180). He identified additional conditions in an adult disability report two months later including plantar fasciitis, arthritis, sleep apnea, depression, anxiety, sciatic nerve pain and right arm tendonitis. (Docket Entry # 11, Tr. 230).

On December 17, 2012, the Social Security Administration ("SSA") denied plaintiff's claim. (Docket Entry # 11, Tr. 76-91, 115-117). The claim was denied again on reconsideration on October 15, 2013. (Docket Entry # 11, Tr. 89, 110). On December 9, 2013, plaintiff filed a request for a hearing. (Docket Entry # 11, Tr. 121-123). In his brief to the ALJ, plaintiff identified various impairments including plantar fasciitis. (Docket Entry # 11, Tr. 172). A hearing was held on November 19, 2014 before an Administrative Law Judge ("ALJ"). (Docket Entry # 11, Tr. 34). The ALJ denied plaintiff's claim on January 13, 2015. (Docket Entry # 11, Tr. 11-33).

On April 1, 2016, the appeals council denied plaintiff's request for review thereby affirming the ALJ's decision as the final decision. (Docket Entry # 11, Tr. 1-6). Plaintiff filed

this action against the Commissioner pursuant to 42 U.S.C. §
1383(c)(3).

FACTUAL BACKGROUND

I. Plaintiff's Background and Medical History

Plaintiff was 47 years old on the date the application was
filed.  (Docket Entry # 11, Tr. 26).  He had at least a high
school education.  (Docket Entry # 11, Tr. 26).  On October 14,
2009, Stanley Leitzes, M.D. ("Dr. Leitzes") provided plaintiff
with an injection of Depo-Medrol for plantar fasciitis.  (Docket
Entry # 11, Tr. 312).  Dr. Leitzes' notes state that plaintiff
sought "some alteration of his work day being on his feet" and
that Dr. Leitzes "will alter that from an 8 to a 6 hour work day
at this time and ascertain if that will help."  (Docket Entry #
11, Tr. 313).  On December 21, 2009, plaintiff reported that his
plantar fasciitis continued to cause "discomfort during the
day."[1]  (Docket Entry # 11, Tr. 310).  On August 5, 2010, Arthur
Carriere, M.D. ("Dr. Carriere") administered a steroid injection
into plaintiff's left heel and suggested another injection on
October 5, 2010.  (Docket Entry # 11, Tr. 412-414).

On February 15, 2011, an MRI revealed disc osteophyte
complexes at C3-4, C4-5, and C5-6, with neural foraminal
stenosis at each level, and cervical kyphosis at C6-7 with a

_____

[1]   The above treatment took place prior to the alleged
disability period.

3

large anterior osteophyte.  (Docket Entry # 11, Tr. 404-405).

Plaintiff completed a depression assessment on March 10, 2011

and reported having little interest or pleasure in doing things,

feeling down, depression, sleeping issues, fatigue, an inability

to concentrate and a feeling that he was a failure "nearly every

day."  (Docket Entry # 11, Tr. 402).

On March 22, 2011, Dr. Carriere injected plaintiff's left

foot with Depo-Medrol and Xylocaine.  (Docket Entry # 11, Tr.

315).  Dr. Carriere's notes reflect that plaintiff had a "good

response" to the prior "cortisone injection."  (Docket Entry #

11, Tr. 315).

On August 4, 2011, plaintiff underwent a physical

examination with Lucia Dias-Hoff, M.D. ("Dr. Dias-Hoff") on

behalf of the University of Massachusetts Disability Evaluation

Services ("UMDES").  (Docket Entry # 11, Tr. 320).  During that

exam, he reported pain in his neck, back and left foot.  (Docket

Entry # 11, Tr. 320).  Additionally, plaintiff disclosed that

when his neck is "very painful[,] he has to lie down" and pain

bilaterally radiates down his arms.  (Docket Entry # 11, Tr.

320).  Dr. Dias-Hoff noted plaintiff had decreased range of

motion in the cervical spine, tenderness in the left heel and

atrophy in the left leg and noted that "[h]e seemed to have low

back pain when sitting on the exam table."  (Docket Entry # 11,

Tr. 321).

On September 1, 2011, plaintiff received facet injections
in his neck with steroids and sterile water at C3-4, C4-5 and
C5-6.  (Docket Entry # 11, Tr. 486).  On October 27, 2011,
plaintiff reported neck pain radiating through his left arm,
foot pain and difficulty sleeping to Janet Encarnacion, M.D.
("Dr. Encarnacion"), his primary care doctor.  (Docket Entry #
11, Tr. 391).  On November 21, 2011, plaintiff underwent medial
branch block injections of Depo-Medrol and 1/2% bupivacaine at
C3, C4, C5 and C6.  (Docket Entry # 11, Tr. 484).  On January 5,
2012, plaintiff still complained of neck pain and stated that he
was experiencing numbness in his hands during a visit with Dr.
Encarnacion.  (Docket Entry # 11, Tr. 386).

On February 1, 2012, Mark Chernin, M.D. ("Dr. Chernin")
administered injections to plaintiff's neck at C3-4, C4-5 and
C5-6.  (Docket Entry # 11, Tr. 480).  On May 29, 2012, plaintiff
reported that his neck pain persisted and he was given cervical
epidural steroid injections on May 29, 2012.  (Docket Entry #
11, Tr. 478).

On July 16, 2012, during a visit to Scott Aronson, D.P.M.
("Dr. Aronson"), a podiatrist, plaintiff complained of left heel
pain that he reported had been present for years.  (Docket Entry
# 11, Tr. 234, 334).  He claimed his pain was an eight on a ten-
point scale, that he stood at work and that he had received
cortisone injections, the most recent being six months prior.

(Docket Entry # 11, Tr. 334).  Upon examination, Dr. Aronson
assessed plaintiff as experiencing plantar faciitis in the left
foot.  (Docket Entry # 11, Tr. 334).  Dr. Aronson identified a
number of treatment options and recommended that plaintiff wear
soft, over-the-counter "insoles, heel cups and cushions for use
in [a] supportive shoe."  (Docket Entry # 11, Tr. 335).  Dr.
Aronson also discussed the option of custom molded foot
orthotics and provided plaintiff with written instructions
regarding plantar faciitis including stretching exercises for
his calf muscle and hamstring twice a day.  (Docket Entry # 11,
Tr. 335).  In addition, Dr. Aronson prescribed a night splint
for plaintiff's left foot to use on a daily basis.  He also
"[d]iscussed the fact that conservative care options usually
decrease symptoms 80-90% in 6 months."  (Docket Entry # 11, Tr.
335).

On October 2, 2012, during another a visit to Dr. Aronson,
plaintiff again reported left heel plain and described the pain
as an eight on a ten-point scale.  (Docket Entry # 11, Tr. 336).
Plaintiff reported that a July 16, 2012 injection "helped a
little" and that he had "not had time to get a night splint."
(Docket Entry # 11, Tr. 336).  Plaintiff requested "a cortisone
injection" and Dr. Aronson administered an injection of
Lidocaine and Depo-Medrol.  (Docket Entry # 11, Tr. 336).  Dr.
Aronson's notes show "no improvement" of the plantar fasciitis.

(Docket Entry # 11, Tr. 336).  He "recommended continued use of current treatment and at-home instructions for the next 3 months time at which point this condition should fully subside." (Docket Entry # 11, Tr. 336).

On October 16 and November 7, 2012, plaintiff underwent cervical epidural steroid injections by Ashraf Farid, M.D. ("Dr. Farid") at Brockton Hospital.  (Docket Entry # 11, Tr. 473, 476).  On November 15, 2012, state agency physician Theresa Kriston, M.D. ("Dr. Kriston") reviewed the record including plaintiff's complaints of plantar fasciitis.  (Docket Entry # 11, Tr. 84-86).  She concluded that plaintiff was capable of occasionally lifting and/or carrying up to 20 pounds; frequently lifting and/or carrying up to ten pounds; standing for four hours in a workday; sitting for about six hours in a work day; changing position every five minutes; and occasionally pushing and pulling due to left "plantar fasciitis/heel pain."  (Docket Entry # 11, Tr. 84-86).  State agency physician Phyllis Sandell, M.D. ("Dr. Sandell") reiterated these findings in April 3, 2013. (Docket Entry # 11, Tr. 104-106).

On December 6, 2012, plaintiff underwent a consultative examination with John Hennessy, Ph.D. ("Dr. Hennessy") and reported depression secondary to his medical conditions. (Docket Entry # 11, Tr. 341-345).  During that visit, plaintiff reported poor concentration, difficulty sleeping, low energy and

decreased motivation.  (Docket Entry # 11, Tr. 341-45).
Additionally, Dr. Hennessy noted that plaintiff's "coping
ability indicates he gets easily overwhelmed."  (Docket Entry #
11, Tr. 344).

On January 24, 2013, Dr. Encarnacion expressed difficulty
treating plaintiff's plantar fasciitis because plaintiff was
unable to afford splints not covered by insurance.  (Docket
Entry # 11, Tr. 358).  She described plaintiff's foot pain as
"stable."  (Docket Entry # 11, Tr. 358).  During a February 14,
2013 medication check with Dr. Encarnacion, she urged plaintiff
to see a psychiatric counselor "for depression/anxiety."
(Docket Entry # 11, Tr. 357).  Dr. Encarnacion's notes reflect
that plaintiff was "currently undergoing treatment by podiatry"
for his plantar fasciitis.  (Docket Entry # 11, Tr. 356).  On
March 14, 2013, plaintiff reported right elbow and forearm pain,
which reached ten on a ten-point scale with movement.  (Docket
Entry # 11, Tr. 354).  At that appointment, the physician
assistant assessed that plaintiff suffered from right lateral
epicondylitis.  (Docket Entry # 11, Tr. 355).

In March 2013, plaintiff's urine test was positive for
cocaine.  (Docket Entry # 11, Tr. 456).  In April 2013,
plaintiff went on vacation to Colorado.  (Docket Entry # 11, Tr.
461).  On May 28, 2013, plaintiff saw Molly Ciri, Ph.D. ("Dr.
Ciri").  (Docket Entry # 11, Tr. 437).  Dr. Ciri's notes reflect

that plaintiff's "[a]ffect [was] marked by significant anxiety and depression" and he was diagnosed with a:  (1) "Mood Disorder Due to Head, Neck and Back Injury with a Major Depressive Like Episode"; (2) "Generalized Anxiety Disorder"; and (3) "Panic Disorder with Agoraphobia."  (Docket Entry # 11, Tr. 439).  Dr. Ciri determined that plaintiff had a GAF score of 45.  (Docket Entry # 11, Tr. 439).  Dr. Ciri's notes state that:

> Robert Glass is a 48-year-old man who is presenting evidence of memory loss and difficulties with remembering and maintaining previous acquired skills . . . Robert was unable to remember three words, spell the word "world" backwards, or count by Serial Threes . . . He is presenting with significant depression and anxiety as well as with apparent memory deficits.  It is apparent that he would have difficulties carrying out physical tasks that require him to sit, stand, [or] walk . . . His ability to remember and carry out instructions appears to be compromised by memory deficits.  Robert's ability to respond appropriately to supervision, coworkers, and work pressures in a work setting is negatively impacted by his current emotional status.

(Docket Entry # 11, Tr. 440).

In July 2013, plaintiff went on vacation to Las Vegas. (Docket Entry # 11, Tr. 456).  At a July 30, 2013 visit with Dr. Farid, plaintiff again complained of left foot pain.  Plaintiff reported that the pain medications "help[ed] relieve his pain" and improved his mobility and activity level.  Dr Farid's impression was that plaintiff had "cervical facet joint pain" and "left foot plantar fasciitis."  (Docket Entry # 11, Tr. 456).

During a subsequent medication management visit at a pain
management clinic at Brockton Hospital with Schahid A. Rawoof,
M.D. ("Dr. Rawoof"), Dr. Rawoof noted three "documented episodes
of inappropriate urine specimens" and plaintiff's "repeated
inability to bring his medications for [a] pill count." (Docket
Entry # 11, Tr. 457).[2] Dr. Rawoof's outpatient report listed
plaintiff's "pain-related considerations," including plantar
fasciitis. (Docket Entry # 11, Tr. 457).

On August 9, 2013, plaintiff reported that the pain in his
heel was increasing. (Docket Entry # 11, Tr. 453). Dr. Rawoof
opined that "ongoing functional benefit with opioids though
efficacy appears to be waning, likely due to tolerance."
(Docket Entry # 11, Tr. 453). At that appointment, plaintiff
identified "rest" and "lying down" as ameliorative activities
and alternative medications, such as Methadone, Morphine Sulfate
and Fentanyl, were discussed. (Docket Entry # 11, Tr. 453-454).
Dr. Rawoof reported he would consider this in the fall as
plaintiff was currently doing a lot of driving. (Docket Entry #
11, Tr. 453). Plaintiff reported that he had been helping a
friend with some painting and, on occasion, "takes more

---

[2]   Although the outpatient report dates the visit as July 30,
2013, the report states that plaintiff was given "a taper" from
opioids on September 13, 2013.

medication than prescribed" which is "generally associated with overactivity . . .." (Docket Entry # 11, Tr. 453).

On June 3, 2014, Dr. Encarnacion noted that plaintiff "has chronic back pain with degenerative disk disease, chronic pain from lateral epicondylitis and plantar fasciitis." (Docket Entry # 11, Tr. 498). The main reason for the visit was "to fill out disability forms." (Docket Entry # 11, Tr. 498). At that appointment, plaintiff reported depression and anxiety were preventing him from working. (Docket Entry # 11, Tr. 498).

On October 16, 2014, for purposes of the Emergency Aid to Elderly, Disabled, and Children Program, UMDES found that plaintiff was suffering from a disability that was expected to last through September 16, 2015. (Docket Entry # 11, Tr. 511). On October 22, 2014, during a visit to May Louie, M.D. plaintiff reported "constant paresthesia in all ten fingers" and an EMG revealed "moderate left median mononeuropathy at/or distal to the wrist." (Docket Entry # 11, Tr. 503).

On November 17, 2014, during a visit to Dr. Encarnacion, plaintiff complained of back, neck and right knee pain. (Docket Entry # 11, Tr. 512). Dr. Encarnacion's notes from that appointment reflect that plaintiff was suffering from tenderness in the cervical region and decreased range of motion. (Docket Entry # 11, Tr. 513). On November 24, 2014, neck X-rays reported by Raghu Amaravadi, M.D. noted "degenerative disc space

narrowing at C6-7 with anterior osteophyte present . . . [and] neural foraminal stenosis at C3-4 and C4-5 resulting from facet arthropathy." (Docket Entry # 11, Tr. 517). The radiology report additionally states, "There is no evidence of fracture or subluxation." (Docket Entry # 11, Tr. 517).

## II. ALJ Hearing

During the hearing before the ALJ on November 19, 2014, plaintiff and a vocational expert testified. Plaintiff testified that his left foot had plantar fasciitis, that his foot hurt from his heel to his knee and, in response to the ALJ's question, that plaintiff wore a boot and did stretches for it. (Docket Entry # 11, Tr. 44-45). Plaintiff stated that his girlfriend went shopping for groceries for him and did the laundry, the housework and the cooking. (Docket Entry # 11, Tr. 49-50). His girlfriend also did the driving, according to plaintiff's testimony. (Docket Entry # 11, Tr. 51). Responding to a question by his attorney about the injections in his heel for plantar fasciitis, plaintiff testified that the injections made the heel hurt. (Docket Entry # 22, p. 57).

The vocational expert detailed plaintiff's past work history as a carpenter (DOT 860.381-022), a "medium skilled occupation" that had a specific vocational preparation ("SVP") of seven; a siding installer (DOT 863.684-014), a medium semi-skilled position with an SVP of four; and a hotel maintenance

12

worker (DOT 323.687-018), a position requiring "heavy,
unskilled" work. (Docket Entry # 11, Tr. 62-63). The
vocational expert stated that plaintiff lacked transferable
skills because any skills acquired during these occupations
"would all be occupationally specific." (Docket Entry # 11, Tr.
63). Based on limitations suggested by the ALJ, the vocational
expert stated that plaintiff was incapable of performing his
past relevant work. (Docket Entry # 11, Tr. 65).

The vocational expert also testified that plaintiff could
perform other work as a "shipping checker," which she described
as a sedentary and unskilled work with an SVP of two. (Docket
Entry # 11, Tr. 66). She described the shipping checker job as
writing and keyboarding. (Docket Entry # 11, Tr. 69). The
Dictionary of Occupational Titles ("DOT") section applicable to
a shipping checker defines the occupation as entailing light
work with an SVP of three. See DOT 222.687-030, 1991 WL 671797
(1991). The DOT cited by the vocational expert is for an
"addresser," which consists of light work such as sorting mail
and addressing envelopes, packages and other items by hand or a
typewriter. See DOT 209.587-010, 1991 WL 671797 (1991). Thus,
although referring to the occupation as a "shipping checker,"
the vocational expert described a job consistent with an
addresser. The ALJ cited the correct DOT in his opinion and
correctly classified the occupation as sedentary and unskilled

with an SVP of two, albeit referring to "the job as a shipping checker."[3]  (Docket Entry # 11, Tr. 27).  Handling and fingering in an addresser job exist "frequently," i.e., from one-third to two-thirds of the time.  See DOT 209.587-010, 1991 WL 671797 (1991).  The vocational expert testified that the "shipping checker" job would be precluded because it primarily requires writing or keyboarding.

In addition to a "shipping checker," the vocational expert testified that plaintiff could perform the job of a visual inspector (DOT 726.684-050), a sedentary and unskilled position with an SVP of two; and an assembly machine tender (DOT 754.685-014), a light and unskilled position with an SVP of two. (Docket Entry # 11, Tr. 65).  A visual inspector entails handling, i.e., grasping,[4] and fingering "constantly," i.e., two-thirds or more of the time.  See DOT 726.684-050, 1991 WL 671797 (1991).  Under the DOT, an assembly machine tender involves handling "occasionally" (up to one-third of the day) and fingering "frequently" (from one-third to two-thirds of the day).  See DOT 754.685-014, 1991 WL 671797 (1991).  The

---

[3]  At the hearing, plaintiff's counsel did not object to the testimony or query the vocational expert about the discrepancy. Accordingly, "[b]ecause the inconsistency was not identified during the hearing, the ALJ was not required to explain the conflict" or "'reopen the record.'"  Sullivan v. Colvin, 2015 WL 1308695, at *13 (D.Mass. March 24, 2015).  As a result, "there was no violation of SSR 00-4p."  Id.
[4]  See the next footnote.

hypothetical posed to the vocational expert restricted grasping,
which is a subset of handling,[5] to half of an eight-hour day.
The vocational expert included this restriction in finding that
plaintiff could perform all three jobs.[6]  (Docket Entry # 11, Tr.
64).  Plaintiff's counsel did not object to the discrepancy
between the DOT's restriction on handling/grasping for a visual
inspector and "shipping checker" (addresser) and the vocational
expert's testimony in response to the hypothetical limiting
grasping for a "shipping checker" (addresser) and a visual
inspector to half a day.[7]

The ALJ's hypothetical relative to step five also included
the restriction that plaintiff "avoid smoke, dust, fumes [and]
certain noxious chemicals that may affect breathing."  (Docket
Entry # 11, Tr. 63).  The vocational expert adopted and

---

[5]  See Castro v. Astrue, 2011 WL 3500995, at *11 (E.D.Cal. Aug.
9, 2011) ("grasping is subsumed under the definition of handling
and the two are not differentiated by the SCODICOT or the DOT");
Cook v. Barnhart, 2004 WL 162960, at *8 (D.N.H. Jan. 23, 2004)
(noting that "frequent left-handed grasping" is a "subset of the
full range of 'handling'").
[6]  The DOT includes three levels of activity:  (1) occasional,
"which is activity that exists up to one-third of the time in an
occupation"; (2) frequent, "which occurs between one-third and
two-thirds of the time"; and (3) constant, "which is activity
that exists two-thirds or more of the time in an occupation."
Dussault v. Colvin, 2017 WL 633352, at *3 (D.N.H. Feb. 16,
2017).
[7]  At best, plaintiff's attorney referred to grasping when he
asked the vocational expert about the impact if plaintiff was
limited in "*fingering* and *manipulating* to only half of the day."
(Docket Entry # 11, Tr. 69) (emphasis added).

incorporated these restrictions in concluding that plaintiff could perform all three jobs. (Docket Entry # 11, Tr. 63, 65). At the hearing, plaintiff's counsel asked the vocational expert if any of the three positions were "performed in a warehouse setting" because of the ALJ's limitation as to "dust and fumes." (Docket Entry # 11, Tr. 68-69). In a somewhat equivocal response, the vocational expert explained her interpretation of the ALJ's limitation as meaning there could be no concentrated exposure or working "in a fume, but" that the visual inspector and the assembly machine tender "are manufacturing jobs." (Docket Entry # 11, Tr. 69).

With respect to absenteeism, the ALJ asked the vocational expert how many days or work plaintiff could miss without compromising one of these three jobs. She explained that missing one day a month would not necessarily preclude employment but missing two or more days a month would not "be tolerated." (Docket Entry # 11, Tr. 66). She agreed with the ALJ's assertion that, "if [plaintiff] missed more than one day a month [due to pain, depression and anxiety], . . . he would not be employable." (Docket Entry # 11, Tr. 66).

On January 13, 2015, the ALJ issued a decision that plaintiff was not disabled as defined under 42 U.S.C. § 1614(a)(3)(A). (Docket Entry # 11, Tr. 11, 16, 28).

DISCUSSION

16

I.  <u>Jurisdiction and Standard of Review</u>

This court has the power to affirm, modify or reverse the
ALJ's decision with or without remanding the case for a hearing.
42 U.S.C. § 405(g).  Findings of fact by the ALJ are conclusive
if supported by substantial evidence.  <u>See Richardson v.
Perales</u>, 402 U.S. 389, 390 (1971); <u>Seavey v. Barnhart</u>, 276 F.3d
1, 9 (1st Cir. 2001); <u>Manso-Pizarro v. Secretary of Health and
Human Services</u>, 76 F.3d 15, 16 (1st Cir. 1996).  Findings of
fact are not conclusive if the ALJ derived such facts by
"ignoring evidence, misapplying the law, or judging matters
entrusted to experts."  <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st
Cir. 1999).

This court must affirm the ALJ's conclusion if it is
supported by substantial evidence "even if the record could
arguably support a different result." <u>Rodriguez Pagan v.
Secretary of Health and Human Services</u>, 819 F.2d 1, 3 (1st Cir.
1997).  Substantial evidence exists if, "reviewing the evidence
in the record as a whole," a reasonable mind "could accept it as
adequate to support the Commissioner's conclusion." <u>Rodriguez
v. Secretary of Health and Human Services</u>, 647 F.2d 218, 222
(1st Cir. 1981); <u>accord</u> <u>Musto v. Halter</u>, 135 F.Supp.2d 220, 225
(D.Mass. 2001) (quoting <u>Ortiz v. Secretary of Health & Human
Services</u>, 955 F.2d 765, 769 (1st Cir. 1991)).  Conflicts in the
evidence are for the ALJ, not the courts, to resolve.  <u>Rodriguez</u>

v. Secretary of Health and Human Services, 647 F.2d at 222.

II.   Disability Determination

      To receive SSI benefits, the plaintiff "must show she has a

'disability,'" Johnson v. Colvin, ___ F.Supp.3d ___, 2016 WL

4639134, at *6 (D.Mass. Sept. 6, 2016), which is defined as an

inability:

>  to engage in any substantial gainful activity by reason of
>  any medically determinable physical or mental impairment
>  which can be expected to result in death or has lasted or
>  can be expected to last for a continuous period of not less
>  than 12 months.

42 U.S.C. § 1382c(a)(3).  Impairments must be of such severity

that the claimant is not only unable to do his previous work

but, in consideration of his or her "age, education and work

experience, engage in any other kind of substantial gainful work

which exists in the national economy."  42 U.S.C. § 1382c(a)(3).

      To determine whether a claimant is disabled within the

meaning of the statute, the SSA applies a five-step evaluation

process and considers all of the evidence in the record.  20

C.F.R. § 416.920; see Goodermote v. Secretary of Health and

Human Service, 690 F.2d 5, 6 (1st Cir. 1982).  In the first

step, the claimant is not disabled if he or she is currently

employed.  See Goodermote, 690 F.2d at 6.  If the claimant is

not employed, the ALJ proceeds to the second step to evaluate if

the claimant has a severe impairment or combination of

impairments.  See id.  A severe impairment or combination of

impairments must meet a durational requirement of "not less than 12 months" and "significantly" limit the claimant's "physical ability to do basic work activities."  20 C.F.R. §§ 416.909, 416.920(c).

If the claimant is not found to have a severe impairment or combination of impairments, he or she is not disabled.  See Goodermote, 690 F.2d at 7.  If the claimant has a severe impairment or combination of impairments, then the analysis proceeds to the third step and the ALJ determines if the claimant's severe impairment or combination of impairments meets or is medically equivalent to one of the listed impairments in Appendix 1, Subpart P, Part 404 of the Code of Federal Regulations.  20 C.F.R. § 416.920(a)(4); see Goodermote, 690 F.2d at 7.  If the impairment or combination of impairments meets or medically equals a listed impairment then the claimant is disabled.  If not, the analysis proceeds to step four.  See Goodermote, 690 F.2d at 7.

At step four, the ALJ must determine if the claimant can perform any of his past relevant work[8] by comparing the claimant's current residual functional capacity ("RFC") with the mental and physical demands of the claimant's past work.  See 20

---

[8]  Past relevant work is any substantial gainful activity "lasting long enough for you to learn how to do it" done in the past 15 years.  20 C.F.R. § 416.960; SSR 82-62, 1982 WL 31386 (Jan. 1, 1982).

C.F.R. § 416.920(a)(4); Manso-Pizzaro, 76 F.3d at 17.  If the
claimant can perform any of his past relevant work, the claimant
is not disabled.  See Goodermote, 690 F.2d at 7.  In the first
four steps, the burden to provide evidence and to prove an
inability to perform past work rests with the claimant.  See
Manso-Pizzaro, 76 F.3d at 17; Freeman v. Barnhart, 274 F.3d 606,
608 (1st Cir. 2001) ("applicant has the burden of production and
proof at the first four steps of the process").

     If the claimant successfully satisfies his burden by
showing he can no longer perform his past work, the burden
shifts to the Commissioner to show the existence of a
significant number of other jobs in the national economy that
the claimant could perform.  20 C.F.R. §§ 416.920(g),
416.960(c); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987);
Goodermote, 690 F.2d at 7; Rosado v. Secretary of Health
and Human Services, 807 F.2d 292, 294 (1st Cir. 1986).  In
making this determination at step five, the ALJ must consider
the claimant's RFC, age, education and work experience.  20
C.F.R. §§ 416.920(g), 416.960(c).  The claimant is not disabled
if jobs the claimant can perform exist in significant numbers in
the national economy.  20 C.F.R. §§ 416.920, 416.945,
416.960(c).

III.  ALJ's Decision

At step one of the "five-step sequential evaluation
process," the ALJ found that plaintiff had not engaged in
"substantial gainful activity" since his application date, July
16, 2012. (Docket Entry # 11, Tr. 16). At step two, the ALJ
determined that plaintiff had the following severe impairments:
degenerative disc disease, depression and anxiety. (Docket
Entry # 11, Tr. 16).

At step three, the ALJ held that plaintiff's impairments
did not meet or medically equal the severity requirement of any
listed impairments of per se disability in Appendix 1, Subpart
P, Part 404 of the Code of Federal Regulations. (Docket Entry #
11, Tr. 17). Prior to his step four analysis, the ALJ concluded
that plaintiff retained the RFC to perform light work, as
outlined in 20 C.F.R. § 416.967(b),[9] but only if said work made

---

[9]  The above regulation defines "light work" as follows:

> Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects weighing
> up to 10 pounds. Even though the weight lifted may be very
> little, a job is in this category when it requires a good
> deal of walking or standing, or when it involves sitting
> most of the time with some pushing and pulling of arm or
> leg controls. To be considered capable of performing a
> full or wide range of light work, you must have the ability
> to do substantially all of these activities. If someone
> can do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to sit
> for long periods of time.

20 C.F.R. § 416.967.

allowances for his functional limitations: "the freedom, after every thirty minutes, to stand and stretch or if he were to be walking or standing he would need the freedom to momentarily sit, before returning to what he was doing." (Docket Entry # 11, Tr. 20). Additionally, the ALJ determined that plaintiff must "avoid dust, smoke, fumes and certain noxious chemicals and should not work overhead." (Docket Entry # 11, Tr. 20). The ALJ found that plaintiff could "finger, feel and manipulate but is restricted to grasping for one-half of an eight-hour workday." (Docket Entry # 11, Tr. 20). Continuing on, the ALJ determined that plaintiff was capable of repetitive tasks and working without supervision. (Docket Entry # 11, Tr. 20). The ALJ noted that plaintiff "should not work in tandem with coworkers" but could handle "casual contact" with other employees. (Docket Entry # 11, Tr. 20). Finally, the ALJ determined that plaintiff had the RFC to handle "basic, momentary or casual contact with the public" but could not engage in "contact with the general public in which instructions and/or information is given or received." (Docket Entry # 11, Tr. 20).

Reaching step four, the ALJ concluded that plaintiff was not capable of performing his past relevant work as a carpenter, siding installer and maintenance worker. (Docket Entry # 11, Tr. 26). At step five, the ALJ found that other jobs "exist[ed]

22

in significant numbers in the national economy" that plaintiff could perform based on his age, education, work experience and RFC. (Docket Entry # 11, Tr. 27). In particular, the ALJ agreed with the vocational expert's assessment that plaintiff was capable of transitioning into representative occupations, such as a shipping checker, visual inspector and machine tender. (Docket Entry # 11, Tr. 27). The ALJ found that, due to plaintiff's ability to perform this other work, plaintiff was not disabled. (Docket Entry # 11, Tr. 27).

## IV. Plaintiff's Arguments

In attacking the Commissioner's decision, plaintiff raises the following arguments. (Docket Entry # 18, p. 9). First, he contends that the ALJ failed to consider plaintiff's plantar fasciitis when determining plaintiff's RFC. Second, plaintiff maintains that the ALJ frequently mischaracterized evidence in his decision by disparaging plaintiff's medical impairments to make them appear less severe. (Docket Entry # 18, p. 14). Finally, plaintiff submits that the vocational expert's testimony regarding other jobs that plaintiff could perform, which the ALJ relied on at step five, was erroneous. (Docket Entry # 18, p. 11).

## A. Failure to Consider Plantar Fasciitis

Plaintiff argues that the ALJ failed to consider plaintiff's plantar fasciitis when determining plaintiff's RFC.

23

(Docket Entry # 18).  Plaintiff submits that the ALJ's assertion
regarding plaintiff's ability to stand contrasted to his foot
pain is a "massive discrepancy."  (Docket Entry # 18).
Plaintiff further maintains that the failure to address
plaintiff's plantar fasciitis at all in the written opinion
suggests that the ALJ ignored this impairment when considering
plaintiff's RFC.  (Docket Entry # 18).  Plaintiff contends that
"if the ALJ ignores evidence and fails to consider all severe
and nonsevere impairments when assessing a claimant's RFC, the
ALJ's decision lacks substantial evidence."  (Docket Entry # 18)
(citing Healy v. Colvin, 2014 WL 1271698, at *9 (D.Mass. March
27, 2014)).

     The Commissioner asserts that the state agency physicians
reviewed the record and explicitly noted plaintiff's plantar
fasciitis (Docket Entry # 11, Tr. 84, 104).  (Docket Entry #
23).  The ALJ afforded these opinions some weight and thereby
incorporated this evidence into his evaluation, according to the
Commissioner.  (Docket Entry # 23).  The Commissioner also
maintains that any error by the ALJ of "omit[ting] plantar
fasciitis as a severe impairment" was harmless.  (Docket Entry #
23).

     An RFC determination must be based on "all the relevant
medical and other evidence" in the case record and it reflects
the most a claimant can do despite his or her limitations.  20

24

C.F.R. § 416.945(a).  Where, as here, a claimant has more than
one impairment, the ALJ must consider all of the claimant's
impairments, including the claimant's "medically determinable
impairments that are not 'severe,'" when assessing the
claimant's RFC.  20 C.F.R. § 416.945(a).  Although "the ALJ must
consider the entire record, he is 'not required to discuss each
piece of evidence in the record specifically.'"  Sullivan v.
Colvin, 2015 WL 5613163, at *5 (D.Mass. Sept. 24, 2015) (quoting
Goncalves v. Astrue, 780 F.Supp.2d 144, 149 (D.Mass. 2011)).  In
addition, as pointed out by the Commissioner, "Even if an ALJ
overlooks some single piece of evidence, the error will be
deemed harmless so long as the ALJ has 'explicitly considered
"all symptoms," both severe and nonsevere, in assessing
Plaintiff's residual functioning capacity and there is no
indication that the ALJ failed to consider the cumulative effect
of these impairments.'"  Healy v. Colvin, 2014 WL 1271698, at *9
(D.Mass. Mar. 27, 2014) (quoting Perez v. Astrue, 2011 WL
6132547, at *4 (D.Mass. Dec. 7, 2011)).  Both parties cite Healy
as a basis for their arguments.

     In Healy v. Colvin, the claimant argued that the ALJ erred
by overlooking the evidence that the claimant's "back pain,
plantar fasciitis and sleep apnea were severe impairments" at
step two.  Healy v. Colvin, 2014 WL 1271698, at *1, 8.  The
claimant in Healy was diagnosed with these conditions, but there

was insufficient evidence to suggest they were severe. See id.
at *9. Specifically regarding the plantar fasciitis, there were
only a few instances in the medical record referencing the
condition. See id. at *4. Thus, although "the ALJ focused the
majority of her opinion on Healy's pain, she also addressed
Healy's . . . plantar fasciitis." Id. at *10. The ALJ also
"recognized that Healy had been diagnosed with" plantar faciitis
as well as sleep apnea and experienced back pain "but reasonably
relied on substantial evidence that these diagnoses did not
prevent Healy from being mobile or functional." Id. at * 9.
Because the references to plantar faciitis in the medical record
were not extensive, the Healy court deemed it "appropriate for
the ALJ to focus her impairment analysis on the foremost cause
of the pain-joint pain-during her step two analysis." Id. The
court also found it significant that the ALJ mentioned "Healy's
foot pain in her written opinion" and asked "Healy about it
during the hearing" and, consequently, "did not ignore medical
evidence of plantar fasciitis." Id.

    In contrast, the ALJ's opinion is devoid of any reference
to plantar faciitis, heel pain and plaintiff's treatment with
Dr. Aronson, his podiatrist. In arriving at the RFC, the ALJ
focused the analysis on neck pain, the lumbar spine and carpal
tunnel syndrome along with plaintiff's activities and mental

impairments.[10]  (Docket Entry # 11, Tr. 21-26).  Carefully
reviewing the opinion for any indication that the ALJ considered
plaintiff's plantar faciitis and associated, alleged heel pain,
the ALJ noted, in the context of discussing plaintiff's anxiety
and depression, that plaintiff "was rude to staff members" in
Dr. Encarnacion's practice and, as a result, "was not allowed to
see the podiatrist in their practice."  (Docket Entry # 11, Tr.
22, 366).  In the same context, the ALJ recounted Dr.
Encarnacion's statement that plaintiff's "gait was, 'coordinated
and smooth.'"  (Docket Entry # 1, Tr. 22, 363-364).  Placed in
this context, the foregoing comments do not address or imply
consideration of plaintiff's plantar faciitis and associated,
alleged heel pain.

When addressing plaintiff's cervical and lumbar range of
motion, the ALJ referred to Dr. Rawoof's outpatient report
summarizing the August 9, 2013 visit wherein Dr. Rawoof stated
that plaintiff's lumbar range was "well preserved" and his "gait
was normal."  (Docket Entry # 11, Tr. 22, 453).  The ALJ's
discussion of pain elsewhere in the RFC discussion, which
includes his assessment that plaintiff could stand or walk for
six hours a day, is bereft of any indication that he considered

---

[10]  In contrast to the omission of plantar faciitis, the ALJ
otherwise provides a careful and exemplary analysis of the
record.

plaintiff's plantar faciitis and alleged heel pain. (Docket
Entry # 11, Tr. 24). Rather, the ALJ stated that he considered
plaintiff's "lumbar and cervical pain." (Docket Entry # 11, Tr.
24). In short, the ALJ's decision fails to indicate that he
considered plaintiff's plantar faciitis and purported heel pain.

At the hearing, the ALJ explored plaintiff's pain and asked
him what was bothering or troubling him. In addition to
identifying other ailments, plaintiff responded that, "My left
foot has plantar faciitis" and it hurts from the heel up to the
knee. (Docket Entry # 11, Tr. 44). The ALJ then asked
plaintiff if he wore an orthotic, to which plaintiff replied
that he wore a foot cast or boot at night and stretched every
day. (Docket Entry # 11, Tr. 44-45). Except for this brief
exchange and plaintiff's brief testimony of foot pain elsewhere
as preventing his ability to walk or stand for more than a
couple minutes, the ALJ did not consider plaintiff's plantar
faciitis, his associated, alleged heel pain or any resulting
standing limitations from the condition.

The Commissioner nevertheless asserts that the state agency
physicians reviewed the record, including plaintiff's plantar
faciitis, and concluded that he could stand for four hours in an
eight-hour work day. (Docket Entry # 11, Tr. 84, 104) (Docket
Entry # 23). Because the ALJ increased the number of hours
plaintiff could stand to six and afforded plaintiff more

frequent opportunities to rest after standing (Docket Entry # 11, Tr. 20), the Commissioner reasons that the ALJ incorporated evidence of plaintiff's plantar faciitis into his decision. (Docket Entry # 23).

It is true that the ALJ afforded the two opinions "some weight." (Docket Entry # 11, Tr. 25). The Commissioner also aptly points out that "the ALJ did not adopt" the state agency physicians' "pushing and pulling limitations for the lower left extremity." (Docket Entry # 23, n.4). It is precisely that finding, however, that comprises part of the state agency physicians' consideration of plaintiff's plantar faciitis. (Docket Entry # 11, Tr. 84, 104) ("LLE to occasional push/pull due to persistent L plantar faciitis/heel pain"). The ALJ also did not adopt the four-hour standing/walking limitation by the state agency physicians. (Docket Entry # 24, 84, 104). Indeed, in discussing a six-hour standing/walking limitation, which the ALJ found reasonable but did not expressly carry over into the RFC,[11] the ALJ was discussing plaintiff's pain and limited motion

---

[11] The ALJ did find that plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 916.967(b). (Docket Entry # 11, Tr. 20). Section 916.967(b) defines "light work" as requiring "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls." 20 C.F.R. § 916.967(b). As to the former, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Social Security Ruling 83-10, 1983 WL 31251 (1983)." "If someone can do light work, . . . he or she can also do sedentary

of his "cervical and lumbar spine neck" and his carpal tunnel
syndrome. (Docket Entry # 11, Tr. 24). Hence, the ALJ did not
incorporate the plantar faciitis finding into his decision. In
any event, the fact that the ALJ gave "some weight" to the state
agency physicians' findings does not sufficiently indicate that
he considered plaintiff's plantar faciitis, alleged heel pain
and associated functional limitations resulting from the
condition.

Thus, although the ALJ stated that he reviewed "the entire
record" and "considered all [of plaintiff's] symptoms" in
determining the RFC (Docket Entry # 11, Tr. 20), there is no
indication in the decision that he considered plaintiff's
plantar faciitis, alleged heel pain and any resulting standing
or walking limitation. The brief exchanges at the hearing,
without more, do not provide a basis to adequately show that he
considered the foregoing. In light of the repeated references
in the record by various medical sources to the condition and
the symptoms plaintiff reported during the purported period of
disability, cf. Healy v. Colvin, 2014 WL 1271698, at *10 ("ALJ
gave both medical conditions [sleep apnea and plantar faciitis]

work, unless there are additional limiting factors such as loss
of fine dexterity or inability to sit for long periods of time."
20 C.F.R. § 416.967(b). Although a visual inspector is a
sedentary position, it entails handling, i.e., grasping
constantly and the RFC restricts plaintiff "to grasping for one-
half of an eight-hour day." (Docket Entry # 11, Tr. 20).

appropriate consideration, *proportionate* to their presence in
the record and their overall impact on Healy's work ability")
(emphasis added), as well as this court's conclusion that the
ALJ did not expressly or impliedly consider the plantar faciitis
or purported heel pain, see id., at *9, the error was not
harmless.  Even if the plantar faciitis is deemed nonsevere, the
ALJ is tasked with considering all of plaintiff's symptoms,
"'both severe and nonsevere, in assessing Plaintiff's residual
functional capacity.'"  Id. (noting that harmless error applies
as long as ALJ "'explicitly considered "all symptoms," both
severe and nonsevere, in assessing Plaintiff's residual
functional capacity and there is no indication that the ALJ
failed to consider the cumulative effect of these
impairments'").

Here, the failure to consider the plantar faciitis, the
pain symptoms it purportedly elicited and the limitations, if
any, it imposed at step two and, more notably, in arriving at
the RFC and thereafter posing the hypotheticals to the
vocational expert is not harmless.  Such consideration could
have altered the RFC and the resulting hypothetical questions to
the vocational expert to exclude the three jobs at issue at step
five.[12]

---

[12]    Except for the plantar faciitis issue and the other two
arguments plaintiff makes, namely, the mischaracterization of

"[I]f an essential factual issue has not been resolved, as here, and there is no clear entitlement to benefits, [as here,] the court must remand for further proceedings." Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001); Puleio v. Colvin, 2015 WL 5722731, at *11 (D.Mass. Sept. 29, 2015) ("reviewing court may reverse or remand the ALJ's decision when the ALJ ignored evidence, or made legal or factual errors"); see also Coulombe v. Colvin, 2016 WL 1068875, at *8 (D.R.I. Feb. 19, 2016) (when "[c]ourt cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision"), report and recommendation adopted, 2016 WL 1069057 (D.R.I. Mar. 17, 2016). In the case at bar, the ALJ ignored the evidence relative to plaintiff's plantar faciitis, the alleged heel pain it purportedly elicited and any resulting limitations on standing and walking such that a remand is not an empty exercise. See Jenkins v. Colvin, 2015 WL 5093290, at *3 (D.Me. Aug. 28, 2015) (finding remand to be appropriate remedy where ALJ "ignored relevant and material evidence" or erroneously weighed

---

the evidence and the reliance on the vocational expert's testimony, plaintiff has waived any other argument that he did not raise as to the current ALJ decision. See Bowman v. Colvin, 2013 WL 1907454, at *5 (D.Me. Mar. 31, 2013) (discussing waiver on remand); see generally Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir. 2010); Mills v. Apfel, 244 F.3d 1, 8 (1st Cir. 2001); Jordan v. Colvin, 2017 WL 262007, at *7 (D.Mass. Jan. 18, 2017).

conflicting evidence and citing Seavey v. Barnhart, 276 F.3d at
10-11).

A sentence four limited remand to consider the plantar
faciitis during the sequential process, including the RFC
determination along with any symptoms, limitations and
functional impact on plaintiff's ability to perform his past
work or other work that exists in sufficient numbers in the
national economy is therefore warranted.[13]  It is the province
and the discretion of the ALJ to determine if the testimony of a
vocational expert is needed based on the ALJ's "resolution of
the conflicting evidence."  Seavey v. Barnhart, 276 F.3d at 12
("leav[ing] the question of additional evidence to the
discretion of the ALJ, based on his resolution of the
conflicting evidence of nonexertional impairments").

B.   Mischaracterizing Evidence and Disparaging Impairments

Plaintiff submits that the ALJ frequently mischaracterized
evidence in his decision, disparaging plaintiff's medical
impairments to make them appear less severe.  (Docket Entry #
18).  Plaintiff further contends that "[m]isrepresentation of
medical evidence is a common theme throughout the ALJ's

---

[13]  See previous footnote.  A revised decision consistent with
this opinion to address the plantar faciitis is therefore
necessary.

decision, which portrayed plaintiff's aliments in a less-taxing manner." (Docket Entry # 18).

The mischaracterized evidence plaintiff identifies consists of the November 2014 neck X-rays and Dr. Rawoof's August 9, 2013 opinion of the waning effect of opioid medications. As to the former, plaintiff points out that the neck X-rays discovered "degenerative disc space narrowing at C6-7 with anterior osteophyte present . . . [and] neural foraminal stenosis at C3-4 and C4-5 resulting from fact [sic] arthropathy." (Docket Entry # 18) (citing Docket Entry # 11, Tr. 517). Plaintiff submits that the ALJ referred to this diagnosis as mere "degenerative changes." (Docket Entry # 18) (citing Docket Entry # 11, Tr. 24). Plaintiff also criticizes the ALJ's failure to discuss certain alternative medications.

As to Dr. Rawoof's opinion, plaintiff contends that the ALJ never mentioned that on August 9, 2013 Dr. Rawoof opined that "ongoing functional benefit with opioids though efficacy appears to be waning, likely due to tolerance" and the ALJ did not discuss the alternative medications, such as Methadone, Morphine Sulfate, and Fentanyl which were discussed at that appointment. (Docket Entry # 18) (citing Docket Entry # 11, Tr. 453). The ALJ did state he "considered the type, dosage and effectiveness of the claimant's pain medication." (Docket Entry # 11, Tr. 24).

First, plaintiff has shown no error with respect to the X-rays.  The ALJ accurately interpreted the X-rays and found that plaintiff had "degenerative changes, but no acute fracture or subluxation." (Docket Entry # 11, Tr. 24).  Thus, the ALJ accurately recounted the radiology report which concludes with the "Impression:  "No acute fracture or sublaxation.  Degenerative changes described above." (Docket Entry # 11, Tr. 24, 517).  The ALJ also explained the reason for the X-ray, namely, a fall on November 16, 2014 when plaintiff hit his head on an open door.  (Docket Entry # 11, Tr. 24, 512-515).  The ALJ did not mischaracterize the X-rays by not reciting the underlying findings in the radiology report that support the above impression.  Rather, he accurately portrayed the X-rays and considered the reason for the X-rays.

Second, with respect to plaintiff's medications, the ALJ expressly acknowledged that he considered the "type, dosage and effectiveness" of plaintiff's pain medication.  (Docket Entry # 11, Tr. 24).  The ALJ's decision also reflects that the ALJ considered the plaintiff's response to medication.  (Docket Entry # 11, Tr. 21-24).  The ALJ expressly recited Dr. Rawoff's report of the August 9, 2013 visit, including the fact that plaintiff admitted taking more medication than he was "prescribed, 'on occasion,' that was, 'generally associated with overactivity.'" (Docket Entry # 11, Tr. 22) (quoting Dr.

Rawoof's report of August 9, 2013 visit). In fact, the ALJ
recounted at length the objective findings by Dr. Rawoof during
his examination of plaintiff at the August 9, 2013 visit.
(Docket Entry # 11, Tr. 22, 453). The ALJ did not
mischaracterize the visit and he considered the dosage and
effectiveness of medication in the context of plaintiff engaging
in increased activity. As previously stated, the ALJ "is 'not
required to discuss each piece of evidence in the record
specifically.'" Sullivan v. Colvin, 2015 WL 5613163, at *5.
The fact that the ALJ summarized Dr. Rawoof's one-page report of
the August 9, 2013 visit also leads to the conclusion that the
ALJ considered Dr. Rawoof's assessment of the waning effect of
opioids due to tolerance and Dr. Rawoof's plan to consider the
alternative medications on the same page of the report. The
ALJ's failure to recite this assessment and plan does not
mischaracterize the record. Consequently, plaintiff's related
assertion that the ALJ therefore adjudicated "'matters entrusted
to experts'" (Docket Entry # 18) (quoting Nguyen v. Chater, 172
F.3d 31, 35 (1st Cir. 1999)) lacks a foundation in the record.

In sum, plaintiff's contention that the ALJ frequently
mischaracterized evidence in his decision, disparaging
plaintiff's medical impairments to make them appear less severe
is misplaced. The ALJ did not mischaracterize the evidence
regarding plaintiff's X-rays and did not overlook the evidence

regarding plaintiff's pain medication.  Overall, the ALJ did not otherwise mischaracterize the record.

## C.   Reliance on Vocational Expert's Testimony at Step Five

Consistent with the vocational expert's testimony, the ALJ found that plaintiff would be able to work as a "shipping checker" (DOT 209.587-010), visual inspector (DOT 726.684-050) and machine tender (DOT 754.685-014) given his assigned RFC. (Docket Entry # 11, Tr. 27).  Plaintiff contends that the vocational expert's testimony regarding other jobs that plaintiff could perform, which the ALJ relied on at step five, was erroneous.  (Docket Entry # 18).  As to the shipping checker and the visual inspector, plaintiff argues that the grasping limitation in the RFC differed from the grasping limitation in the DOT categories.  The ALJ's failure to elicit a reasonable explanation for the conflict from the vocational expert was therefore erroneous, according to plaintiff.  As to the assembly machine tender job, plaintiff points out that the vocational expert testified that the position could be performed in a warehouse or manufacturing setting.  Because a warehouse or manufacturing setting entails exposure to dust, smoke, fumes or noxious chemicals (which the RFC precludes), plaintiff reasons that the number of assembly machine tender jobs plaintiff could perform is reduced and the ALJ therefore failed to meet his

burden regarding assembly machine tender jobs in the national
economy.

Turning to the first argument, when "the vocational
expert's testimony is inconsistent with the information
contained in the" DOT, "the ALJ 'must elicit a reasonable
explanation for the conflict before relying on the vocational
expert's evidence to support a determination or decision about
whether the claimant is disabled.'" Beede v. Colvin, 2017 WL
414059, at *4 (D.N.H. Jan. 31, 2017 (quoting SSR 00-04p, 2000 WL
1898704 (Dec. 4, 2000) ("SSR 00-04p")) (internal brackets
omitted).  Although neither the DOT nor the vocational expert
"'evidence automatically "trumps" when there is a conflict,' it
is incumbent on the ALJ to 'resolve the conflict by determining
if the explanation given by the vocational expert is reasonable
and provides a basis for relying on the vocational expert
testimony rather than on the DOT information.'"  Id. (remanding
due to failure to resolve conflict) (internal brackets omitted).

Here, the DOT for the "shipping checker" (addresser) and
the visual inspector require handling, and its subset of
grasping, respectively for one third to two thirds of the time
(addresser) and two thirds or more of the time (visual
inspector).[14]  See DOT 209.587-010, 1991 WL 671797 (1991); DOT

---

[14]  The vocational expert erroneously testified that the DOT for
a visual inspector required handling up to one third of the day.

726.684-050, 1991 WL 671797 (1991).  As to both jobs, the
vocational expert found that plaintiff could perform them based
on the hypothetical's restriction to half a day of grasping.
(Docket Entry # 11, Tr. 64-65, 69).  The vocational expert did
not address the discrepancy between the actual DOT
handling/grasping restrictions for these two jobs and the
hypothetical's grasping restriction for these two jobs.  On the
other hand, neither plaintiff's attorney nor the vocational
expert identified any such discrepancy to the ALJ.[15]

In accordance with SSR 00-4p, "an ALJ need only resolve
conflicts between evidence provided by a vocational expert and
the DOT when the inconsistency is apparent and has been
identified."  Sullivan v. Colvin, 2015 WL 1308695, at *13
(D.Mass. Mar. 24, 2015).  "'[C]laimants should not be permitted
to scan the record for implied or unexplained conflicts between
the specific testimony of an expert witness and the voluminous
provisions of the DOT, and then present that conflict as
reversible error, when the conflict was not deemed sufficient to
merit adversarial development in the administrative hearing.'"

---

[15]  It is true that plaintiff's attorney posed the following
question to the vocational expert:  "And also for those jobs, I
know . . . in the Judge's hypothetical inquiry he included the
limitation of grasping for, for half of the day.  What if they
were also limited to *fingering* and *manipulating* to only half the
day?"  (Docket Entry # 11, Tr. 69) (emphasis added).  The
question did not involve the grasping discrepancy between the
DOT and the two above jobs.

Id. (quoting Carey v. Apfel, 230 F.3d 131, 146-47 (5th Cir.
2000), in parenthetical). The issue is also waived. See Mills
v. Apfel, 244 F.3d 1, 8 (1st Cir. 2001) (affirming lower court's
finding that plaintiff waived claim by not mentioning it to
ALJ).

As to plaintiff's second argument regarding the
environmental limitations relative to the assembly machine
tender job, the DOT does not include limitations regarding dust,
fumes, smoke and noxious chemicals. See DOT 754.685-014, 1991
WL 680374 (1991). Rather, the DOT depicts the occupation in a
setting where toxic caustic chemicals and other environmental
conditions are "[n]ot present." DOT 754.685-014, 1991 WL 680374
(1991). The vocational expert testified that plaintiff could
perform this job but acknowledged that it was a manufacturing
job. The vocational expert also interpreted the hypothetical to
mean that plaintiff would not "be working outside or working in
a fume." (Docket Entry # 11, Tr. 69). She further testified
there would be 210,000 jobs in the national labor market and
3,500 jobs in the Massachusetts labor market for the assembly
machine tender occupation. (Docket Entry # 11, Tr. 65). Placed
in the context of the vocational expert's entire testimony,
plaintiff's argument that there was uncertainty regarding the
number of assembly machine tender jobs in the national economy
simply because the vocational expert acknowledged that the

40

assembly machine tender was a "manufacturing job" is misplaced. Hence, it was not error for the ALJ to rely on the vocational expert's findings that plaintiff was capable of a successful adjustment to "work that exists in significant numbers in the national economy." (Docket Entry # 11, Tr. 27).

Finally, plaintiff argues that the vocational expert did not directly address whether plaintiff was capable of working on a full-time basis without missing more than one day per month. (Docket Entry # 18). Plaintiff asserts that it is the ALJ's responsibility to question the vocational expert as to whether plaintiff can perform full-time work. Plaintiff submits that the ALJ's failure to resolve plaintiff's "ability to work on a fulltime basis, missing less than one day per month, constitutes reversible error." (Docket Entry # 18).

In response to the ALJ's questions, the vocational expert testified that missing one day of work per month would not preclude employment although it "would be above average.'" (Docket Entry # 11, Tr. 66). Missing two or more days a month, however, would "not likely be tolerated," according to the vocational expert. (Docket Entry # 11, Tr. 66). The ALJ therefore questioned the vocational expert to determine the number of days required to perform the three jobs on a full-time basis. The vocational expert did not, however, explicitly

determine that plaintiff had the ability to work five days a
week for a month and miss only one day of work.

     In the ALJ's decision, the ALJ concluded that plaintiff had
the RFC to perform the aforementioned three jobs which, in light
of the foregoing testimony by the vocational expert, would
implicitly require plaintiff not to miss work more than one day
a month.  In fact, "Ordinarily, RFC is an assessment of an
individual's ability to do sustained work-related physical and
mental activities in a work setting on a regular and continuing
basis" and a "'regular and continuing basis' means 8 hours a
day, for 5 days a week, or an equivalent work schedule."  SSR
96-8p, 1996 WL 374184, at *1 (July 2, 1996).  By determining the
RFC, the ALJ implicitly included the finding that plaintiff had
the ability to work eight hours a day, five days a week.  The
ALJ thus resolved that plaintiff was capable of performing full-
time work and plaintiff's argument that the ALJ did not make
such a determination is unavailing.

CONCLUSION

     In accordance with the foregoing discussion, this court
**RECOMMENDS**[16] that:  (1) plaintiff's motion for an order reversing

---

[16]   Any objections to this Report and Recommendation must be
filed with the Clerk of Court within 14 days of receipt of the
Report and Recommendation to which objection is made and the
basis for any such objection.  See Rule 72(b), Fed.R.Civ.P.  Any
party may respond to another party's objection within 14 days

or remanding the decision of the Commissioner (Docket Entry #
17) be **ALLOWED** to the extent of remanding this action to the
Commissioner to consider the plantar faciitis during the
sequential process, including the RFC determination along with
any symptoms, limitations and functional impact on plaintiff's
ability to perform his past work or other work that exists in
sufficient numbers in the national economy; and (2) the
Commissioner's motion to affirm the Commissioner's decision
(Docket Entry # 22) be **DENIED** insofar as this court is remanding
this action as stated above.

_/s/ Marianne B. Bowler_
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

after service of the objections.  Failure to file objections
within the specified time waives the right to appeal the order.